AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
для the
Southern District of California

FEB 1 5 2019

CLERK US...
SOUTHERN DIST... CALIFORNIA
BY                                        DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. 19MJ0692
White, Telcel Subscriber Identity Module (SIM Card), )
8952020917611343646F )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-5.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-5.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Marijuana |

The application is based on these facts:

See attached affidavit of HSI Special Agent Daniel Lundberg

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Lundberg, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/12/19

_____
*Judge's signature*

City and state: San Diego, California        Hon. William V. Gallo, United States Magistrate Judge
                                              *Printed name and title*

# AFFIDAVIT

I, Special Agent Daniel Lundberg, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic devices (collectively the **Target Devices**):

   a. Black, Alcatel cellular phone, Model A464BG
   IMEI: 014499009071406
   (**Target Device #1**)

   b. Black, Telcel cellular phone, Model F1811
   IMEI: 352897086315267
   (**Target Device #2**)

   c. Purple, LG Touch screen cellular phone,
   cracked screen, purple button on back, LG emblem bottom center of front screen
   (**Target Device #3**)

   d. Black, Samsung Galaxy S cellular phone, Model SCH-1500
   (**Target Device #4**)

   e. White, Telcel Subscriber Identity Module (SIM Card),
   8952020917611343646F
   (**Target Device #5**)

   f. White, Telcel Subscriber Identity Module (SIM Card),
   8952020018210386969F
   (**Target Device #6**)

as described in Attachments A1-A6, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Josephine CEDILLO (Defendant) for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized on November 1, 2018 at the Otay Mesa Port of Entry in San Diego, CA. The **Target Devices** were seized from Josephine

1

CEDILLO pursuant to her arrest for importation of federally controlled substances. The **Target Devices** are currently stored as evidence at 880 Front St., Suite 3200, San Diego, CA 92101 within the Homeland Security Investigations (HSI), Office of the Special Agent in Charge (SAC).

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B1-B6.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am a Special Agent employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed as a Special Agent since December 2016. I attended and completed the Federal Law Enforcement Training Center Criminal Investigator Training Program, as well as the HSI Special Agent Training program. Before becoming a Special Agent, I was employed at the Dorchester County Sheriff's Office in South Carolina from February 2007 to December 2016. I started my career at the Sheriff's Office as a patrol deputy, before becoming a narcotics investigator. I was then promoted to the narcotics unit sergeant. In 2006, I received a bachelor's degree in Criminal Justice with a minor in Security Administration from Western Illinois University.

6. During my career as a law enforcement officer, I have been responsible

2

for investigating a number of different crimes including, but not limited to, property crimes, drug crimes, and sex crimes. I have arrested or assisted with the arrest in excess of eight-hundred (800) persons for drug-related offenses. I have interviewed or been present during the interview and evaluation of over nine-hundred (900) subjects who have been involved in the usage and/or sales of controlled substances or who have specific information relating to usage and/or sale of controlled substances. I have also assisted other street narcotic units within other municipal, state, and federal narcotics units with search and arrest warrants for drug related offenses.

7. Based on my training and experience, I am familiar with the ways in which drug smugglers and traffickers conduct their business. Indeed, during the course of my duties I have (1) worked as a case agent, directing specific drug-related investigations; (2) utilized informants to purchase quantities of controlled substances; (3) acted in an undercover capacity to purchase quantities of controlled substances; (4) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (5) participated in the execution of search warrants related to drug investigations; (6) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; (7) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances; and (8) participated in large scale highway interdiction activities. Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they

receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

   f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

   g. The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

   a. tending to identify attempts to import marijuana or some other federally controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of marijuana or some other federally controlled substance from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of marijuana or some other federally controlled substance from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of marijuana or some other federally controlled substance

5

       from Mexico into the United States, such as stash houses, load houses, or delivery points;

  e.   tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

  f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. According to a report prepared by Customs and Border Protection (CBP) Canine Enforcement Officer (CEO) T. Pittman, on October 31, 2018, at approximately 9:20 p.m., Officer Pittman and his assigned Human and Narcotics Detection Dog (HNDD) were conducting pre-primary roving operation at the Otay Mesa, California port of entry. The HNDD alerted and responded to the rear cargo area of a U-Haul bearing Arizona license plates, which was located in pre-primary lane #3. CEO Pittman made contact with the driver and solo occupant of the U-Haul, who was identified as Josephine CEDILLO. CEDILLO informed CEO Pittman that she was attempting to enter into the United States to go to her aunt's residence in La Jolla, California. CEO Pittman opened the rear cargo door and observed an overwhelming soap like odor. CEO Pittman then advised assisting officers of the canine alert and directed the U-Haul to be driven through the Z-Portal. After the U-Haul was driven through the Z-Portal, CBP Officer Carrera, who was operating the machine, detected anomalies inside the furniture which the U-Haul contained. CEO Pittman again inquired about where CEDILLO was going in La Jolla. CEDILLO changed her story and told CEO Pittman that she did not know anyone in La Jolla and was entering the United States to move some of her aunt's furniture into an apartment. CEO Pittman inspected a wooden cabinet in the area where the anomalies were observed. CEO Pittman pried back a corner and observed a large plastic wrapped bundle he knew to be consistent with narcotics. The vehicle was then taken to secondary inspection.

12. According to a report prepared by CBP Officer Corey, Officer Corey was assigned to inspect the vehicle in the secondary lot. Officer Corey conducted a 7-point inspection on the vehicle. During his inspection, he located a total of (33) thirty-three bundles concealed within (2) two dressers. Officer Corey probed a random package, which revealed a plant like substance. The plant like substance field-tested presumptive for the properties and/or presence of marijuana. The total weight of the marijuana was found to weigh approximately 362.66 kilograms (799.52 pounds). Officer Corey subsequently processed and seized the marijuana, a sample of the marijuana, U-Haul, and (4) four cellphones with miscellaneous SIM cards found in CEDILLO's possession.

13. Homeland Security Investigations (HSI) Special Agent (SA) Michael Hensley and I conducted a custodial interview with Josephine CEDILLO. I read CEDILLO her *Miranda* Rights in English, reading from a preprinted form, in the presence of SA Hensley. Post *Miranda*, CEDILLO agreed to waive her constitutional rights and speak with us. During the custodial interview, CEDILLO went on to detail the incident as such; On October 29, 2018, CEDILLO rented a U-Haul truck using a fraudulent driver's license. CEDILLO explained that she rented the U-Haul to see if she would be able to successfully use the fraudulent license. CEDILLO stated that if successful, she was planning on renting a rental car, selling it to a group of individuals in Tijuana, and reporting it stolen. CEDILLO stated she rented the U-Haul to see if she would be able to successfully use the license. CEDILLO also said that she used this opportunity to move some of her items into the United States in preparation for moving to San Diego with her aunt. CEDILLO stated that she allowed a friend known by "Tio" to load the U-Haul while she went to eat dinner. CEDILLO admitted to meeting "Tio" through an app called "Skout" where she would buy marijuana from him. CEDILLO disclosed that she was supposed to contact "Tio" when she crossed into the United States. During the interview, CEDILLO's recollection of the events leading up to the incident changed multiple times when questioned more in detail. CEDILLO was in

1 possession of the **Target Devices** and claimed ownership. CEDILLO was placed under
2 arrest for the violation of 21 U.S.C. §§ 952, and 960.

3     13.    The **Target Devices** were discovered and seized by Customs and Border
4 Protection at the time of Josephine CEDILLO's arrest. On January 3, 2019 Homeland
5 Security Investigations assumed custody of the **Target Devices**.

6     14.    Based upon my experience investigating narcotics traffickers and the
7 particular investigation in this case, I believe that Josephine CEDILLO likely used the
8 **Target Devices** to coordinate the importation of federally controlled substances into
9 the United States. In addition, I believe that recent calls made and received, telephone
10 numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text
11 messages, pictures and other digital information may be stored in the memory of the
12 **Target Devices**, which may identify other persons involved in narcotics trafficking
13 activities. Accordingly, based upon my experience and training, consultation with other
14 law enforcement officers experienced in narcotics trafficking investigations, and all the
15 facts and opinions set forth in this affidavit, I believe that information relevant to the
16 narcotics smuggling activities of Josephine CEDILLO, such as telephone numbers,
17 made and received calls, contact names, electronic mail (e-mail) addresses, appointment
18 dates, messages, pictures, and other digital information are stored in the memory of the
19 **Target Devices**.

20     15.    Finally, I also know that narcotics trafficking activities entail intricate
21 planning to successfully evade detection by law enforcement. In my professional
22 training, education and experience, I have learned that this requires planning and
23 coordination in the days, weeks, and often months prior to the event. Given this, I
24 request permission to search the **Target Devices** for items listed in Attachments B1-
25 B6 beginning on July 31, 2018, up to and including October 31, 2018.

## METHODOLOGY

27     16.    It is not possible to determine, merely by knowing the cellular/mobile
28 telephone's make, model and serial number, the nature and types of services to which

the device is subscribed, and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

19. Based on all of the facts and circumstances described above, there is probable cause to conclude that Josephine CEDILLO used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

20. Because the **Target Devices** was promptly seized during the investigation of Josephine CEDILLO's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by Josephine CEDILLO continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from July 31, 2018, up to and including October 31, 2018.

21. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A1-A6, and the seizure of items listed in Attachments B1-B6, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Daniel Lundberg
HSI Special Agent

Subscribed and sworn to before me this \_\_12\_\_ day of February, 2019.

_____
Hon. William V. Gallo
United States Magistrate Judge

10